# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                  CRIMINAL ACTION NO. 3:19-00206

TYRONE MARQUISE JONES
TERRY JAMES COX

## MEMORANDUM OPINION AND ORDER

Presently pending before the Court are two motions to suppress evidence filed by the defendants in the instant case, Tyrone Marquise Jones and Terry James Cox. *See Jones Mot. to Suppress*, ECF No. 34; *Cox Mot. to Suppress*, ECF No. 36. On November 4, 2019, the Court held a hearing on both motions. *See Hr'g Tr.*, ECF No. 55. The issues have been ably briefed and argued, and they are ripe for resolution. For the reasons set forth below, the Court **DENIES** the motions.

### I. BACKGROUND

Although this case centers on a firearm discovered in the rear seat of a parked vehicle, it actually arises out of the Huntington Violent Crime-Drug Task Force's unrelated attempt to serve subpoenas on two individuals identified as Chandra Ross and Mark Damron on August 9, 2019. *Id.* at 3. The group of officers from the Task Force was comprised of Sergeant Paul Hunter, Sergeant Kerry Arthur, Corporal Greg Moore, and Corporal Stephen Maniskas—all of the Huntington Police Department—as well as Special Agent Sean McNees of the Drug Enforcement Agency. *Id.* at 8. Unsure where Ross and Damron were located, at around 10:00 a.m. the group traveled to Damron's mother's home at 1843 12th Avenue in Huntington, West Virginia. *Id.* at 5, 7. Upon arrival, the officers walked to the front of the house and knocked on the door. *Id.* at 7.

While they received no answer, they did observe a number of live rounds scattered across the front porch. *Id.*

The officers subsequently left the scene to execute a search warrant in Marcum Terrace, approximately a five-minute drive away from 1843 12th Avenue. *Id.* at 42. Near the end of the day, the group returned to the address for a second attempt at serving the subpoenas. *Id.* at 8. As they approached the home in their unmarked police van, they noticed a woman identified as Krishauna Brown on the front porch. *Id.* They also observed a late-model white Mercury sedan parked directly in front of the house, which Sergeant Hunter recognized as the vehicle Brown had been driving during a previous traffic stop. *Id.* at 9. The vehicle was facing west, away from the officers and against the flow of traffic. *Id.* at 9, 19. After drawing a connection between the vehicle and Brown, Hunter recalled that Brown's father—identified as Tony Lee—had reported his vehicle stolen by Damron "three or four days" beforehand. *Id.* at 9–10. Given that Brown was currently on the porch of Damron's mother's home, Hunter speculated that she was "there to try to take out some street justice" on Damron in revenge for the theft of her father's car. *Id.* at 12.

At the same time, the officers also observed two individuals seated in the driver's seat and driver's-side rear seat of the Mercury.[1] *Id.* The officers waited in their van for several minutes to observe the scene, and then decided to approach the vehicle before going to the front of the home to attempt to serve the subpoenas. *Id.* Sergeant Hunter recalled that the officers elected to approach the vehicle because they "wanted to let [the occupants] know that [they] were law enforcement." *Id.* Hunter led the officers from the passenger side, and Corporal Maniskas led the officers on the driver's side. *Id.* at 30. As they approached the vehicle, Maniskas and Hunter—followed by the

---

[1] While the officers could not determine the identity of the vehicle's occupants from their vantage point, Hunter worried that Brown's son Kareem—a juvenile who he believed was wanted on drug and firearms charges—was in the car and dangerous. *Hr'g Tr.*, at 11.

other officers—prominently displayed their badges to identify themselves as law enforcement.[2] *Id.* at 32. Hunter kept his gun in his holster as he approached the vehicle, drawing closer to the rear passenger window. *Id.* at 30.

At this point, the precise series of events becomes slightly less clear. Sergeant Hunter testified that as "soon as [he] displayed [his] badge, Tyrone Jones"—the occupant of the rear driver's-side seat—"immediately looked at me and started reaching off to the left." *Id.* at 13. Corporal Moore recounted a slightly different scene, with Jones repeatedly "making motions down to the right side, possibly concealing or obtaining an object." *Id.* at 58. Finally, Jones himself recalls talking to his niece via a video call on his cell phone and dropping his phone in startled surprise as the officers surrounded the vehicle with their guns already drawn. *Id.* at 72. He claims he "went to pick the phone up," "thinking maybe [he] should keep [his] phone in my hand to record the situation because . . . [of] what was going on." *Id.*

Whatever Jones' exact movements or the actions that motivated them, these stories are not altogether in conflict. It seems clear that at some point while the officers were approaching the vehicle, Jones bent forward and off to his side. This furtive movement alarmed Sergeant Hunter, who "thought he was reaching for a weapon." *Id.* at 15. Hunter immediately drew his service weapon, backed up, and told Jones to show his hands. *Id.* at 14. The other officers drew their weapons simultaneously, and joined Hunter in "yelling hands, hands . . . show me your hands." *Id.* at 16. Jones was initially nonresponsive, but "finally stopped reaching" after bending downward "two to three different times."[3] *Id.*

---

[2] The officers were not in uniform and were not wearing bulletproof vests. *Hr'g Tr.*, 38–39. Their badges were their only form of police identification. *Id.*

[3] Jones explained that he had been unable to hear the officers because he "had . . . headphones on talking to [his] niece." *Id.* at 72. Before he knew what was happening, he claims he saw "barrels"—firearms—all around him. *Id.* Once again, this account corroborates the

At this point, Corporal Maniskas removed the occupant of the driver's seat—identified at the scene as Terry Cox—from the vehicle. *Id.* Sergeant Arthur removed Jones from the vehicle as well, and was in the process of detaining him when Corporal Moore noticed a firearm in the rear seat of the vehicle and alerted the other officers to its presence. *Id.* This discovery made Jones "stiffen up and begin to fight," refusing to follow directions. *Id.* at 16–17. Officers wrestled him to the ground, and went on to secure the Kel-Tec PT3AT .380 pistol and the rest of the scene. *Id.* at 17. They discovered a bag of cocaine base, or "crack," near the site of Jones' arrest, as well as a quantity of crystal meth in the glove compartment. *Id.* at 17–18.

Cox and Jones were subsequently indicted for aiding and abetting the possession of firearms by felons in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2. On October 10, 2019, Jones filed his Motion to Suppress. One week later, Defendant Cox followed with a similar motion. Both Jones and Cox argue that they were "seized" within the meaning of the Fourth Amendment when officers approached the vehicle with their guns drawn, and that they lacked the requisite reasonable suspicion to do so. The United States filed responses to Jones' and Cox's motions on October 17 and October 24, respectively.[4] *Resp. to Jones Mot. to Suppress*, ECF No. 36; *Resp. to Cox Mot. to Suppress*, ECF No. 45. On November 4, the Court held a hearing on both motions at which Sergeant Hunter, Corporal Moore, and Defendant Jones testified. *Hr'g Tr.*, at 3. With this factual and procedural background in mind, the Court turns to the legal considerations that govern the disposition of the instant motions.

---

officers' testimony that Jones was nonresponsive as they issued their commands.

[4] In its Response to Jones' motion, the Government noted for the first time that a Huntington municipal ordinance provided that "[n]o vehicle shall be stopped or parked on a road or street with the vehicle facing in a direction other than the direction of travel on that side of the road or street." *Resp. to Jones Mot. to Suppress*, at 2.

## II. LEGAL STANDARD

The Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Pursuant to the Fourth Amendment, "[t]he Supreme Court has recognized three distinct types of police citizen interactions: (1) arrests, which must be supported by probable cause[;] . . . (2) brief investigatory stops, which must be supported by reasonable articulable suspicion[;] . . . and (3) brief encounters between police and citizens, which require no objective justification." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002). Defendants' motions implicate the second and third categories most directly, notwithstanding their subsequent arrests.

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968). Accordingly, where "a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citing *California v. Hodari D.*, 499 U.S. 621, 628 (1991)) (internal citation and quotations omitted). Of course, it follows that a seizure *has* occurred where a reasonable person would *not* feel free to disregard the police. *Id.* This test is an objective one, asking whether "in view of all of the circumstances surrounding [an] incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

The Fourth Amendment's protections against unreasonable seizures are triggered where an encounter is no longer consensual. *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984). Such investigative *Terry* stops require courts to determine whether a seizure is supported by an officer's reasonable,

articulable suspicion that an individual is engaging in criminal activity. *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012). This suspicion "must be based on specific, objective facts." *Brown v. Texas*, 443 U.S. 47, 51 (1979). In reviewing the constitutionality of a *Terry* stop, courts are required to consider the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for supporting legal wrongdoing." *United States v. Mayo*, 361 F.3d 802, 805 (4th Cir. 2004). This determination must "give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004). Where an officer has reasonable suspicion to conduct an investigatory stop, he is "authorized to take such steps as [are] reasonably necessary to protect [his] personal safety and to maintain the status quo." *United States v. Hensley*, 469 U.S. 221, 235 (1985). This includes drawing a service weapon; after all, "[t]here is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." *Terry*, 392 U.S. at 33 (Harlan, J., concurring).

As a final matter, the Court notes that the Fourth Amendment "says nothing about suppressing evidence obtained in violation" of its commands. *Davis v. United States*, 564 U.S. 229, 236 (2011). Nonetheless, pursuant to the exclusionary rule "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source." *Mapp v. Ohio*, 367 U.S. 643, 654 (1961); *see also Weeks v. United States*, 232 U.S. 383 (1914).

### III. DISCUSSION

The Government advances three principal arguments in favor of the constitutionality of the disputed seizure. First, it contends that the existence of a local ordinance regulating the direction of parked vehicles obviates any need for reasonable suspicion at any point before ordering the

defendants removed from the vehicle. The Court finds this argument unconvincing. To be sure, the Government is correct that "[w]hen an officer observes a traffic violation, he is justified in conducting a stop *to investigate that violation* and to attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (emphasis added); *see also United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019) (reasoning that traffic stops are legitimate "whenever it is lawful for police to detain an automobile and its occupants *pending inquiry into a vehicular violation*"). Yet no matter how pretextual a traffic stop may be, it must still be a traffic stop. *Rodriguez*, 135 S. Ct. at 1614 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

Here, the Government does not contend that policing municipal parking violations is a regular part of the Huntington Violent Crime-Drug Task Force's business. Nor does it argue that Sergeant Hunter or his fellow officers ever had any intent to issue a ticket for the violation. *Hr'g Tr.*, at 19 ("Q. All right. And just to be fair, you weren't going to ticket them [for a parking violation]; is that correct? A. No, sir. Q. All right. That was not your chief concern? A. No, *not at all*."). While well-established precedent "foreclose[s] any argument that the constitutional reasonableness of a traffic stop depends on the actual motivations of the individual officers involved," *Whren v. United States*, 517 U.S. 806, 813 (1996), Sergeant Hunter's testimony makes clear what the factual record suggests: that no investigation into a parking violation ever took place, or would have taken place if events had developed differently. It is logically and constitutionally absurd to conclude that an investigation into a traffic stop justifies a seizure where no traffic stop occurred, and the Court will not do so here.

Second, the Government argues that the officers possessed reasonable suspicion to seize Defendants even before approaching the car. In support of this contention, the Government points

to two pieces of evidence: the shells the officers had observed on the porch earlier in the day, and Krishauna Brown's presence at the house. *Hr'g Tr.*, at 80. Reasonable suspicion is a "commonsense, nontechnical standard that relies on the judgment of experienced law enforcement officers, not legal technicians." *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2000). As always, the Court is mindful that "*post hoc* judicial review of police action should not serve as a platform for unrealistic second-guessing of law enforcement." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (quoting *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985)). Yet for reasonable suspicion to mean anything, the facts and inferences available to an officer must evince "more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). In this case, the mere possibility that Krishauna Brown was present at the 1843 12th Avenue to seek "street justice" for her father's stolen vehicle is nothing more than an unparticularized suspicion, as even the officers involved recognize. *Hr'g Tr.*, at 23 (characterizing concerns about Brown as a "possible suspicion . . . a suspicion that she could be there trying to retrieve the vehicle or make interaction with Chandra Ross"). The ammunition on the front porch was entirely unconnected to Brown, as the officers had discovered it earlier in the day; in any event, its presence does not contribute to any inference that Brown or the defendants were engaged in criminal activity.[5] As such, the Court concludes that reasonable suspicion to seize Defendants did not exist before approaching the stopped vehicle.

If these were the only two grounds the Government could advance to support the constitutionality of the disputed seizure, the Court would be inclined to grant Defendants' motions. Nevertheless, the Government's third argument—that the officers' initial approach "could also be

---

[5] While the ammunition could serve to bolster suspicions of the home's residents, it simply has no bearing on any suspicions the officers possessed with reference to Brown and the defendants.

seen as a police-citizen encounter which . . . does not implicate the Fourth Amendment"—correctly identifies the operative legal principle that governs this case. *Resp. to Jones Mot. to Dismiss*, at 7 (citing *Bostick*, 501 U.S. at 439–40).

"It is axiomatic that police may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections." *Weaver*, 282 F.3d at 309. Such routine interactions are a necessary part of policework, to say nothing of officers' ability to function in the wider world. Here, Sergeant Hunter testified that the officers' purpose in approaching the parked Mercury was "to make sure we were safe first and foremost because we were going to go to that residence," referencing the fact that their backs would be turned to the car once they approached the front door. *Hr'g Tr.*, at 12. Just as importantly, the officers "wanted to let [the vehicle's occupants] know that [they] were law enforcement." *Id.* Hunter and his colleagues thus propose two understandable justifications for approaching the stopped car: officer safety and public safety.

For such a typical police-citizen interaction to implicate the Fourth Amendment, a reasonable person must "have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. Given Defendant Jones' testimony that he was not even aware of the officers' presence until he was surrounded by "barrels," a subjective inquiry would lead to the inevitable conclusion that did not feel trapped in an encounter with the police. Nevertheless, the applicable test is an objective one. *United States v. Analla*, 975 F.2d 119, 124 (4th Cir. 1992). To determine whether a person has been seized, courts view *all* of the circumstances surrounding an incident and consider whether a reasonable person would have believed he was not free to leave. *Mendenhall*, 446 U.S. at 554. In considering whether a police-citizen encounter constitutes a seizure, courts look to the

> number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant

> as though they suspected him of illegal activity rather than treating the encounter
> as routine in nature.

*Jones*, 678 F.3d at 299 (quoting *United States v. Gray*, 883 F.2d 320, 322–23 (4th Cir. 1989)). Importantly, "no one factor is dispositive." *Weaver*, 282 F.3d at 310.

In the present case, the majority of these factors are simply inapplicable given the timeline of events; the officers did not even reach the vehicle until after the furtive movement that caused Sergeant Hunter to draw his weapon. The relevant remaining factors include the number of officers, whether they were in uniform, and whether they displayed their weapons. While five officers were present at the scene, only four approached the car. *Hr'g Tr.*, at 26. They were not uniformed, though they displayed their badges to clearly indicate their identity as law enforcement officers. *Id.* at 28. Upon their initial approach—and before Defendant Jones' suspicious downward movement—it appears the officers kept their weapons holstered.[6] *Id.* at 30, 65. Nothing about this approach is sufficient to transform a consensual police-citizen encounter into a seizure.[7] The Court therefore concludes that the officers did not need any justification to leave their van and begin approaching the Mercury. Indeed, it appears that the officers' goals were to protect themselves and others by making contact with the vehicle's occupants before approaching the house.

As might be expected, the nature of the officers' interaction with the defendants changed dramatically with Defendant Jones' sudden movement and subsequent noncompliance with

---

[6] Sergeant Hunter and Corporal Moore testified that they drew their weapons only after Jones' movement, and the Court considers their testimony credible. *Hr'g Tr.*, at 30, 65.

[7] Of course, "[i]t should be underscored that the meaning of "consensual" in common parlance is different from the meaning of that word in law." *Rutledge v. Town of Chatham*, No. 4:10CV00035, 2010 WL 4791840, at *3 (W.D. Va. Nov. 18, 2010). There have been many—and there will likely be many more—instances where a defendant does not feel free to leave a police encounter, despite the fact that he or she has not been "seized" within the meaning of the Fourth Amendment. Such is the unavoidable product of an objective analysis that requires the Court to determine whether encounters are consensual based on the totality of the circumstances, rather than solely based on a defendant's point of view.

Sergeant Hunter's demands to raise his hands. At this point, what likely would have ended as a routine police-citizen encounter instead transformed into a seizure, supported by reasonable suspicion that criminal activity was afoot. *See Perkins*, 363 F.3d at 321. Specifically, Defendant Jones' repeated downward motions supported Sergeant Hunter's suspicion that he was reaching for a weapon or other dangerous object. *See Hr'g Tr.*, at 15.

Although *Terry* stops are, in general, relatively unintrusive, police officers may take necessary steps to protect themselves without immediately converting an interaction into a full-scale arrest. *See United States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988); *see also United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995) (internal citations omitted) (reasoning that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest"). In analyzing the reasonableness of a *Terry* stop, a court's determination "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor* 490 U.S. 386, 386–87 (1989). While the drawing of weapons is an "extraordinary measure," such actions have "been justified in this circuit as a reasonable means of neutralizing potential danger to police and innocent bystanders." *Taft v. Vines*, 70 F.3d 304, 320 (4th Cir. 1995).

Here, Sergeant Hunter testified that his interaction with Defendant Jones made him extremely concerned for his own safety. *Hr'g Tr.*, at 15 ("I couldn't see either hand, and he went off to the left. That's the closest I've come to ever shooting anyone."). This worry was only compounded by Jones' continued refusal to comply with the officers' simultaneous commands to raise his hands. *Id.* ("I come up, and when I show him my badge, he immediately starts reaching

and refusing directions to show his hands and actually goes down maybe a couple times in that direction."). The officers' decision to seize the defendants by drawing their weapons was therefore supported by reasonable suspicion.

The rest of the Court's analysis proceeds upon well-trodden legal ground. When an officer possesses reasonable suspicion that a vehicle's occupant is armed and dangerous, he may conduct a lawful frisk of that individual. *Arizona v. Johnson*, 55 U.S. 323, 327 (2009). "The officer need not be absolutely certain the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. "In determining whether such reasonable suspicion exists," courts "examine the totality of the circumstances to determine if the officer had a particularized and objective basis for believing that the detained suspect might be armed and dangerous." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal citations omitted). In this case, the officers had reacted to Defendant Jones' sudden, repeated movement by drawing their weapons. As they ordered Jones to raise his hands, he was noncompliant. Both facts gave rise to reasonable suspicion that Jones was armed and dangerous and justified the defendants' removal from the vehicle.

As a final note, the officers' subsequent discovery of the firearm does not implicate constitutional concerns. Corporal Moore testified that he saw a handgun lodged in the Mercury's back seat as he looked inside from the right of the vehicle. *Hr'g Tr.*, at 60. Nothing about this observation constitutes an impermissible search or seizure. *Horton v. California*, 496 U.S. 128, 136–37 (1990) ("[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating

character is immediately apparent."); *see also United States v. Wells*, 98 F.3d 808, 810 (4th Cir. 1996) (upholding seizure of firearm under the plain view doctrine).

Neither the Constitution nor this Court require officers to "take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23. From their consensual approach to the vehicle (which required no justification) to their seizure of the defendants (which was supported by reasonable suspicion) to their discovery of the gun (which was visible in plain sight), the officers acted within the bounds of the Fourth Amendment at all points throughout their encounter with the defendants. Absent any constitutional violation, both motions must be denied.

### IV. CONCLUSION

For the foregoing reasons, Defendants' motions to suppress evidence, ECF Nos. 34, 36, are **DENIED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel and the defendant, the United States Attorney's Office, the United States Probation Office, and the United States Marshals Service.

ENTER: November 21, 2019

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE